IN RE ESTATE OF WILLIAM ELLENBERGER, SR., Deceased.

**EXECUTORS AND ADMINISTRATORS:** Special Administrator—
1, 3 Propriety of Appointment—Discretion of Court. The mere fact that there is some evidence that the application for the appointment of a special administrator is not made in good faith but for the attainment of purposes not authorized by law (Sec. 3299, Code, 1897) is not necessarily sufficient to overthrow an appointment. The legal discretion of the lower court to refuse or to grant the appointment will not be interfered with in the absence of a showing of abuse of such discretion.

**EXECUTORS AND ADMINISTRATORS:** Special Administrator—
2 Appointment—Probate of Will Suspended by Contest—Effect. The filing of a contest of a will prior to the probate thereof has the effect of suspending the immediate probate of said will and authorizes the appointment of a special administrator under Sec. 3299, Code, 1897.

**EXECUTORS AND ADMINISTRATORS:** Special Administrator—
1, 3 Propriety of Appointment—Discretion of Court.

**EXECUTORS AND ADMINISTRATORS:** Special Administrator—
4 Appointment—On What Evidence Determined—Merits of Will Contest. On the question whether a special administrator should be appointed pending the determination of a will contest, the court should not assume to try out the merits of the will contest.

## 226     In re Estate of Ellenberger.     [171 Iowa

**EXECUTORS AND ADMINISTRATORS:** Special Administrator— Basis for Appointment—Prevention of Loss—Incompetency of Those Possessing Estate. The right to appoint a special administrator rests on a fair showing of necessity to protect the estate from loss by the appointment of a disinterested and competent administrator. Such showing may involve some inquiry into the lack of capacity and the presence of undue influence on the part of those claiming the estate and in charge thereof. Appointment sustained in case at bar.

> PRINCIPLE APPLIED: A father had executed deeds and a will of all his lands to his two sons. After his death, the daughters filed a contest of the will and, on their motion, a special administrator was appointed. The evidence showed that for many years the sons had exercised an unlimited dominion, largely savoring of imposition and undue influence, over the property interests of the father, who was blind, helpless and uneducated. The testimony of the son touching the condition of the father's affairs and his knowledge and handling thereof was contradictory, equivocal, evasive, and strongly suggested concealment of the true condition. *Held,* sufficient to support the action of the lower court in making the appointment.

**EXECUTORS AND ADMINISTRATORS:** Special Administrator— Appointment—Briefness of Tenure—Effect. The fact that the tenure of office of a special administrator will be very brief may have bearing on the necessity to review the appointment but presents no reason for reversing the appointment.

**EXECUTORS AND ADMINISTRATORS:** Appointment of Special Administrator—Restraining Order Pending Appeal. It is suggested that, in view of the statute (Sec. 3299, Code, 1897), an order restraining a special administrator from the performance of duty, pending an appeal from the order of appointment, ought not to be entered.

**INJUNCTION:** Interlocutory Restraining Orders Pending Appeal— Effect on Final Decision—Res Judicata. Interlocutory restraining orders issued by one of the judges of the Supreme Court have no bearing on and in no manner control the final decision on appeal.

*Appeal from Johnson District Court.*—Hon. R. P. Howell, Judge.

Tuesday, September 21, 1915.

On the 25th day of September, 1909, William Ellenberger, Sr., made what is alleged to be his last will. He died some time in April, 1914. The probating of this will was

set to be heard on April 30, 1914. Before probate was granted, the three daughters of testator, now appellees, filed notice of contest, and thereupon probating was suspended, and the contest has not yet been tried. In this situation, one' Korab, who is not a party in interest, was, on the application of the daughters, and over the objections of the appellants, appointed special administrator. From this the two sons, chief beneficiaries in the will, appeal.—*Affirmed.*

*Wade, Dutcher & Davis,* for appellees.

*Ney & Bradley,* for appellants.

SALINGER, J.—I.   One attorney for appellees verified the application for a special administrator, and was thereupon subjected to cross-examination.   Appellants assert that this cross-examination reveals that said attorney,

1. EXECUTORS AND ADMINIS- TRATORS: special admin- istrator: pro- priety of appointment: discretion of court.

and his clients, are making application in bad faith, and, for objects not contemplated by the statute, permitting the appointment of special administrator, with intent to harass appellants, who are the chief owners of the estate, and with purpose to exploit that estate by gathering evidence for use in contesting the will and other instruments disposing of the estate, at great expense to such estate. They insist that the administrator who was appointed at the in- stance of appellees is one "whose duty it is to be active and obey the suggestions of the heirs and his attorney." The ultimate argument is that the issue we have to determine is whether a special administrator should be appointed for the purpose of exploiting the estate and finding evidence pend- ing and for use upon said contest. This contention does not require us to pass upon whether a fair construction has been put upon the testimony given by said attorney upon said cross-examination.

We think it sufficient reply that the court appointed an administrator who is by the record shown to be a man of good standing and disinterested; that the presumption must be indulged he will act faithfully within the limits set by the

law; that he will be at all times under full control of the
court; and that, if expense be a material consideration, that
of resisting the appointment, and of this appeal, is greater
than the expense of special administration should be, or under
supervision of the court is likely to be. It may be added,
in passing, (1) that the cross-examination should be used for
all that it establishes, and if it tends to show that the appli-
cation is, in part, prompted by desire to get more than is due
from a special administration, it also shows such feeling on
part of contestants and their counsel as that it would have
been, at least, unwise to appoint any of the appellants; and
(2) it is remarkable that parties who concede it to be the
function of such administrator to be the tool of some who
are interested in the estate should also urge that, if an ap-
pointment were proper, it should have been given to the son
William, rather than to a disinterested person.

II. *Meikle v. Hobson,* 167 Iowa 666, decided in this court
December 15, 1914, is called to our attention. We there de-
cide that, since a party may be a witness in court, if such
party fails to appear to an action in his own right, the other
may, at his election, have a continuance at the cost of the
delinquent, and an action may be dismissed if plaintiff fails
to appear when the case is called for trial; that, in a suit
brought by husband and wife against a third person, neither
is in contempt for refusing to testify on a deposition sued out
by the defendant. This is put on the ground, among others,
that to permit it "would lend the full power of the court
to a process for the discovery not only of the claims of the
opposite party, but also the details of the evidence, so far as
known to the plaintiff, upon which the case would depend,
not regulated by the control which a court will give as to
excluding testimony which is not competent or is forbidden."
The only argument with which we are favored as to the
applicability of this is the statement that "the very purpose
in Judge Wade's mind in the cited case, as shown by this
opinion of the court, is the same illegal scheme as in the case
at bar, as he admits in his evidence as a witness in this case

at bar when he testifies in support of the petition for appointment of Korab as special administrator.''

The essence of our holding in *Meikle's Case* is that, since parties to a suit may be adequately dealt with in open court for failure or refusal to give proper testimony, the general deposition statute should not be resorted to in order to obtain their testimony, because the only possible use of such proceeding would be to obtain testimony, which the court itself would not admit. In its general aspect, it declares the self-evident postulate that the machinery of the law shall not be resorted to colorably; oppressively, nor to obtain what the law does not grant. The mere claim that the application at bar was made for some such purpose is not enough to invoke the application of this rule here, even though there be evidence to sustain the accusation. The statute provides (Code, Sec. 3299) that under given conditions a special administrator ''may'' be appointed. Whether the appointment was sought for improper purposes was one of the things to be presented to and considered by the court applied to. The language of the statute gives that court power to grant or deny. Had the court found that the application was for purposes such as appellants assert, it would have been its duty to use its discretion to deny the application. It follows that the granting of it involves finding as a fact that the application was a rightful one. If there be evidence upon which we would have sustained the court had the finding been to the contrary, the finding it did make is yet so sufficiently sustained by the evidence as that we may not interfere.

III. The Code, Sec. 3299, provides that:

2. Executors and Administrators: special administrator: appointment: probate of will suspended by contest: effect.

''When, from any cause, general administration or probate of a will cannot be immediately granted, one or more special administrators may be appointed to collect and preserve the property of the deceased, and no appeal from such appointment shall prevent their proceeding in the discharge of their duties.''

Under the express language of this statute, a special administrator may be appointed whenever the "probate of a will cannot be immediately granted." The appellees filed a contest upon the will which appellants offered for probate. The contest has not yet been tried. Notwithstanding the claim that as wills may be contested after probate, the statute (Sec. 3283, Code), that "after the will is produced the clerk shall open and read same, and a day shall be fixed by the court or clerk for proving it, which shall be during a term of court, and may be postponed from time to time in discretion of the court," does not provide, expressly at least, that probate shall be held up until after a contest is decided, we are constrained to hold that the bringing and pendency of this contest did produce a situation which prevented immediate probate. This is not only so of necessity, but the language of the Code prohibits the interpretation of appellants. A requirement that a day be fixed, with discretionary postponement from time to time, makes impossible an "immediate" grant of probate, and that probate once granted may be set aside has no bearing on whether probate may be granted before a pending contest is decided.

Additionally, it is urged: (1) that even if conditions existed which authorized appointment, the same was needless because of the character and financial responsibility of resistors, which of itself is a sufficient guard for whatsoever rights contestants have and sufficient warrant for permitting their opponents to have full control of the estate pending contest, to say nothing of the fact that appellants were both willing and able to furnish any bond required to safeguard the ultimate rights of appellees; (2) that though the instituting of a contest prevents the immediate grant of probate and therefore gives the court power to appoint a special administrator, it should, on application therefor, consider whether the contest is frivolous, and try out the very questions that must be determined on

3. EXECUTORS AND ADMINISTRATORS: special administrator: propriety of appointment: discretion of court.

the hearing of the contest and may there be determined by a jury; and (3) that the evidence shows that the contest was purely captious and frivolous, instituted to harass by those who, under the will, have but a small interest in the estate.

The court, in passing upon an application for special administration, is called upon to decide whether it is rightful to grant it. The granting finds, *inter alia,* that the application is neither needless, frivolous, captious nor vexatious. Such decision by the court may rest upon testimony that is relevant in a will contest. But this does not warrant a trial of the contest and a refusal to grant special administration, unless the court is satisfied that the contest should be sustained. The discretion given is not abused, because exercised when it is not absolutely clear that the obstacle to immediate probate is not purely colorable. This must be so for two reasons, at least. The contestant is entitled to a reasonable time to prepare for trial, and should not be denied purely interlocutory relief which may be necessary to preserve the subject of the contest, merely because he has not all the evidence which he may have on the contest trial ready on the hearing of the application for such interlocutory aid. And this application cannot be tried to a jury, while the contest can be. Wherefore, it cannot be that the one hearing is to assume the functions of the other.

Keeping in mind, then, that it is no more our province than it was that of the trial court to determine whether the record exhibits sufficient to set aside the will, we have no hesitation in saying that there was enough to sustain the finding of facts inherent in the order made below, against purely appellate review; that there is enough evidence of danger of loss in the absence of a disinterested and competent administrator, and of lack of capacity and presence of undue influence, for the purposes of this review, as the following shows:

4. EXECUTORS AND ADMINISTRATORS: special administrator: appointment: on what evidence determined: merits of will contest.

5. EXECUTORS AND ADMINISTRATORS: special administrator: basis for appointment: prevention of loss: incompetency of those possessing estate.

Appellant William says he is 41; that his brother Nathan is 33, and his sister Mary about 22; that he, himself, has not gone away in forty years, and never got any wages, but that he bought land in Texas and made the money to pay for it. He adds that he did so by getting the money from home. He stopped working some ten years ago, when the mother died. At that time, the father agreed that if William would stay, he could have all he made. The two brothers did stay, and so did Mary. He admits that Mary has been living with the father and the brothers ever since William was of age, and was the only woman around there. After doing this, he proceeds to minimize it; says she lived there but part of the time, and he does not know how much time she has been away; he does not know whom she has been working for all these years; part of the time nobody kept house there. She was not working for him, but he gave her money, of course, when she was there. He does not know just what she did with it, guesses what he gave her was small amounts for her clothes, but he does not know whether she got clothes with it or not. The brothers rented the farm, some three hundred acres, and did have all they made. But William explains that they had heavy expenses for the father. Those expenses are not detailed, and the record as a whole indicates that the father was not of expensive habits, and rarely went where he could spend money. It is apt to be true that the care of a blind father is expensive; but William, evidently having in mind that too helpless a father might be challenged as a testator or grantor, explains this expense possibility out of existence by saying: "My father was blind before he died, but I cannot say how long. Of course, I don't know if he was blind or not. Of course, he could get around, I don't know whether he was blind or not." William has been running the place for the last twenty years, and the brothers have been caring for and nursing the father for many years. Some ascendency seems thus to have been gained. The father could not so much as write his name. William has done the buying and selling;

he drew on the deposits of the father by signing the name of William. As seen, appellants kept all they made off 300 acres of land, while the land still remained in the name of the father, and afterwards it was conveyed to the sons. Despite the ownership of the land, William says the father has not made a dollar in many years; that everything on the land has for the last ten years belonged to the boys, except the household furniture. As to the furniture, William says he does not know anything about whether the father owns that; that the brothers do not claim to own it, and William is willing that his sisters may have it. In fact, he says anybody may have it. For the father who owned all this land, William did buy groceries and furnish a bed, and says he would have done more than that if the father had said so. For this owner of some $60,000 worth of land, the sons paid his debts, not detailed. His very funeral expenses and bills of his last illness were unprovided for, except as William chose to pay them; but though William went for a man to draw the will and the deeds to all the land and paid the man to draw them, this father, who did not do the simplest business for himself, made this will without the knowledge of his sons, and they did not learn so much as that a will existed, during the five years in which they had charge of the father after the will was made. This father, on his own motion, and as quickly as he could convey the thought and directions to the scrivener, first has deeds made to all he has, and then a will bequeathing an estate he no longer owns, which provides for legacies, leaving nothing wherewith to pay them. He does not mention the will which gives these legacies, but trusts that matter to "independent agreement." This he does, although he delivers the deeds; and at this time, just after the will had been made, and several times before, he gets an agreement to honor his gifts to his three daughters, which were put into the will. When the one son gets the scrivener, he does not get two sisters who live at a not much greater distance away than does the scrivener. When the will is drawn, the boys,

the sister Mary, and the hired man Bane are the only ones at home. Bane participated to some extent, and is not produced.

On one showing by the sons, they had no means on the day the deeds were drawn, other than that William owned some undescribed and unvalued Texas land. But their witness, the scrivener White, claims that the father spoke of several pieces of land then deeded as lands for which the boys had paid him; that it should, therefore, be in their name, and fixed while he was living, so there would be no trouble afterwards. This witness adds that, as to the balance of the land, he guesses it was a cash sale for the amount stated in the deeds as consideration. He says nothing was said as to where the boys were to get the money to pay spot cash, nor as to giving notes, and the witness adds that they had that arrangement among themselves. William, however, clears all this up by saying that nothing was paid for the land, and that he spent all the money he ever got from his father. White says the testator spoke right up and said something about he wanted to make it right,—"fix it up right and equal." Thereupon, to carry out this desire to make things equal, he gave Mary, the daughter who stayed at home, three cows for extra services, and each of his three daughters $1,000, and all the lands to the three boys. He also desired that William be made executor. The will was finished hurriedly, "because it was getting late." William got the deeds and did not record them during the five years that the father lived.

We do not overlook the fact that the scrivener says that, in his opinion, testator was sane; that no coercion was used in his presence, and that all the father's acts were spontaneous; neither do we overlook the fact that this witness makes it plain that he has had little opportunity for judging of the capacity of the father, and that it is not likely acts of coercion were employed in his presence. William offers bonds freely, because he knows all about the property; yet, though he has been running the place for twenty years, he says he

knows nothing about the crops, and that his father never said anything about them. Ever since 1908, he signed his own name in drawing on the deposits of his father, which he says amounted to "a little money." He names the banks of deposit, and "thinks" there was $500 in them when the father died. He says he has the certificates; that they are in the name of his father; but he does not know whether they belong to his father's estate, and he says that nothing belongs to that estate "that he knows of except these deposits."

In connection with offering bond in any sum which the court may in reason order, to assure appellees of their rights as same may ultimately be determined, appellants say they make such offer the more readily because they know the nature, extent and location of all the property the father had at his death. As seen, and as will appear later, they also claim that the father left no property at his death, and that he owned no personal property for ten years before his death. Though, despite their claim there is no property, they are, upon confession, able to point out definitely what personal estate there is, it must be admitted they have not done so in this record, and that some peculiarities are developed as to the personal property, if any there be, and other peculiarities, if there be no estate.

The will was drawn after deeds to all the lands owned by the father had been made. According to appellants, there was no property other than certain lands, except some deposits, relatively unimportant in size, upon which drafts drawn in the name of one son were being honored while the father still lived. There is no explanation why, in such circumstances, a will was drawn at all, and why the testator should say that he was disposing of "real and personal both," as the scrivener says he did, except the claim that the sons knew nothing of the making of a will, which, if true, of course, relieves them from explaining why it was made. This claim, however, is, to put it mildly, also somewhat peculiar. Here is an assertion that the two sons never heard a will mentioned, and knew

absolutely nothing of a will until after the father died, which was some five years subsequent to the making of a will. Now, to begin with, the son William got the man who drew both the deeds and the will. This man says this son came after him, and thinks he wanted him to make out some deeds; that there was something said about the will, about the work in connection with it; that the son took White to make out these deeds; that before they started, White took along a form of will to use as a guide, because William did say there might be possibly something of that kind done; that it was mentioned about it in connection with the business, but White does not remember that anything special was spoken about that until he got to the place. While he was at work, the boys came in two or three times to inquire if testator wanted anything—they just went in and out. The boys paid White, and he believes it was William. To sustain the claim of appellants that they knew nothing of a will until after their father was dead, it must be found, for one thing, that the drawing of the will was not paid for for some five years. William says he was not in the room "when the deeds were drawn," an emphasis or singling out which makes the absence of like claim as to being absent when the will was drawn somewhat conspicuous, in spite of said general denial of knowledge of a will.

Be that as it may, it is striking that when William says that, at the time of the execution of the deeds, the father said the property was to go "to us boys, all that he had was to go to us," not a suspicion arose as to whether there was a will, and no inquiry was made as to what was "all that he had." Again, while the father said nothing about a will, yet he told them they were to pay $3,000 in legacies; and William insists that, while this was said on several occasions before the will and deeds were made, and shortly after the scrivener left who drew them, nothing was said about a will, and that the agreement to pay what the will gives as legacies

was an independent agreement. But even so, and this again is peculiar, no matter how William learned of the legacies, he does not know whether he has ''the property to pay it.'' As he says, also, that the father left nothing but land, and not over $1,000 in bank certificates, and as there is no doubt that 300 acres of land would pay the $3,000 in legacies, the doubt must be whether $1,000 in bank and personal property existing was sufficient to pay expenses of a last sickness, administration and legacies. If there was no personal estate other than the money in bank, it is not doubtful but perfectly clear that the personal property will not pay these expenses and these legacies.

IV. To the argument that settlement of the contest may be long delayed, and that pending it appellants are no more entitled to administer upon this estate than are contestants, appellants say there is an agreement for try-

6. EXECUTORS AND ADMINIS-TRATORS : special admin-istrator : appointment : briefness of tenure : effect.

ing the contest within a very short time. Of course, the final decision of the contest will automatically do away with the special ad-ministrator. But under our rules, the fact, that a cause for appeal has ceased to exist requires dismissal rather than reversal. The possibility that soon there will be no special administrator may have bearing on whether it is necessary to review his appointment, but affords no reason for reversing the appointment.

V. Some reliance is placed upon the fact that, pending appeal, we issued a restraining order. There is reason to feel that the order was improvident because of the provision in Sec. 3299 that ''no appeal from such ap-

7. EXECUTORS AND ADMINIS-TRATORS : ap-pointment of special admin-istrator : restraining order pending appeal.

pointment shall prevent their proceeding in the discharge of their duties.'' Be that as it may, such order which may be made by any one of the judges of the Supreme Court can-not be held to bind us as to the present deci-sion of the appeal. This is true, first, because an injunction re-

straining the appointee from acting until it can be determined

<span style="float:left">8. INJUNCTION:<br>interlocutory<br>restraining<br>orders pending<br>appeal: effect<br>on final deci-<br>sion: res<br>judicata.</span> whether he has the right to act is, of course, no attempt to decide whether the appointment is rightful,—if it were, the subsequent hearing and decision of the appeal would be an idle form; second, because the doctrines of

res judicata or stare decisis in their strict sense do not apply to incidental or interlocutory orders made in the progress of a cause. Black, Judicial Precedents, page 280; 2 Black, Judgments, 2d Ed., Secs. 691, 692.

The judgment below should be, and it is—*Affirmed*.

DEEMER, C. J., LADD and GAYNOR, JJ., concur.